BAYER AG and Bayer
Corp., Plaintiffs,

v.

SCHEIN PHARMACEUTICAL, INC., Danbury Pharmacal, Inc., and Reddy–Cheminor, Inc., Defendants/Counter-claimants.

Bayer AG and Bayer Corp., Plaintiffs,

v.

Mylan Pharmaceuticals Inc., and Mylan Laboratories Inc., Defendants/Counter-claimants.

Civ. No. 99–2181(GEB).

United States District Court,
D. New Jersey.

Feb. 9, 2001.

William J. Bigham, Karen A. Confoy, Sterns & Weinroth Trenton, NJ, Fred H. Bartlit, Jr., Mark L. Levine, Sean W. Gallagher, Bartlit, Beck, Herman, Palenchar & Scott Chicago, for Bayer AG and Bayer Corp.

Andrew Miller, Budd, Larner, Gross, Rosenbaum, Greenberg & Sade PC, Short Hills, NJ, Steven J. Lee, James Galbraith,

Robert V. Cerwinski, Kenyon & Kenyon, NY, for Schein Pharmaceutical, Inc., Danbury Pharmacal, Inc., Reddy–Cheminor, Inc.

Frank Holahan, Harwood Lloyd, LLC, Hackensack, NJ, E. Anthony Figg, Glenn E. Karta, Elizabeth A. Leff, Rothwell, Figg, Ernst & Kurz, P.C., Washington, DC, for Mylan Laboratories Inc., Mylan Pharmaceuticals Inc.

## OPINION

BROWN, District Judge

This matter comes before the Court upon the motion for summary judgment of defendants/counter-claimants Schein Pharmaceutical, Inc., Danbury Pharmacal, Inc. and Reddy–Cheminor, Inc. (collectively "Schein"), the cross-motion for summary judgment of plaintiffs Bayer AG and Bayer Corporation (collectively "Bayer"), and upon Bayer's motion to strike certain arguments raised in Schein's reply brief in the two related actions *Bayer AG v. Schein Pharmaceutical, Inc.*, 99–2181 and *Bayer AG v. Schein Pharmaceutical, Inc.*, 99–5093; and upon the motion for summary judgment of Mylan Pharmaceuticals Inc. and Mylan Laboratories Inc. ("Mylan") and the cross-motion for summary judgment of Bayer in *Bayer AG v. Mylan Pharmaceuticals Inc.*, 99–4659. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1338(a). For the reasons discussed below, Schein and Mylan's motions for summary judgment are denied, Bayer's motion to strike certain arguments raised in Schein's reply brief is granted in part and denied in part, and Bayer's cross-motions for summary judgment are granted.

## I. PROCEDURAL HISTORY

Schein and Mylan filed Abbreviated New Drug Applications ("ANDAs") with the United States Food and Drug Administration ("FDA") pursuant to 21 U.S.C. § 355(j) seeking approval to market generic drug products containing the antibiotic ciprofloxacin. Bayer alleges in its three complaints that the ANDAs infringe Bayer's United States Patent 4,670,444 (the "'444 patent") under 35 U.S.C. § 271(e)(2), which provides that it is an act of infringement to file certain applications with the FDA seeking approval to market drugs claimed in a patent. The defendants counter that the '444 patent is invalid, but otherwise concede that if the patent is not invalid, the marketing of generic products containing ciprofloxacin would infringe the '444 patent. Pursuant to 21 U.S.C. § 355(j)(5)(B)(iii), Bayer's initiation of these actions has stayed the ANDAs pending before the FDA.

Schein argues in its motion for summary judgment that the '444 patent is invalid under 35 U.S.C. § 102(d) because Bayer filed a foreign patent application claiming ciprofloxacin more than twelve months before it filed its United States patent application claiming the same drug and the foreign patent issued before Bayer filed its United States application. Schein further argues that Bayer cannot rely on the filing date of the earlier United States Application No. 292,560 (the "'560 application") pursuant to 35 U.S.C. § 120 because the '560 application does not satisfy the "best mode" requirement of 35 U.S.C. § 112, ¶ 1. Bayer argues in opposition and in support if its cross-motion that the '444 patent is not invalid because it can rely on the earlier filing date of the '560 application pursuant to 35 U.S.C. § 120 and that application satisfies the best mode requirement of 35 U.S.C. § 112, ¶ 1. Bayer also raises three alternative arguments. First, it claims that if the '560 application violates § 112's best mode requirements, then so does the foreign application relied upon by Schein in its § 102(d) argument, thus disqualifying that foreign application as a § 102(d) bar as a matter of law. Second, Bayer argues in the alternative that Schein's § 102(d) defense fails as a matter of law because Bayer is entitled to rely on an earlier filed German patent application pursuant to 35 U.S.C. §§ 119 and 120.

Finally, Bayer argues that Schein cannot rely upon a foreign South African patent as a § 102(d) bar because Bayer did not have the right to enforce that patent under South African law until after it filed the relevant United States counterpart application. Mylan raises substantially the same arguments in support of its motion for summary judgment as Schein raised, but Mylan relies on three additional foreign patent applications filed in Chile, Spain and Argentina in support of its § 102(d) arguments.

Two days after the parties submitted their motion package in accordance with Appendix N of the local rules of civil procedure, the United States Court of Appeals for the Federal Circuit decided *Eli Lilly and Co. v. Barr Laboratories, Inc.*, 222 F.3d 973 (Fed.Cir.2000). For obvious reasons, the Court instructed the parties to submit supplemental briefing on *Lilly*'s impact on the best mode issues presently pending before the Court. The parties submitted additional briefing on the *Lilly* decision and the Court thereafter heard the arguments of counsel.[1]

Before hearing the arguments of counsel, the Court asked the parties why these three actions should not be consolidated for all purposes pursuant to Fed.R.Civ.P. 42(a). All counsel agreed to consolidation, and the Court entered an order consolidating *Bayer AG v. Schein Pharmaceutical, Inc.*, 99–2181, *Bayer AG v. Schein Pharmaceutical, Inc.*, 99–5093, and *Bayer AG v. Mylan Pharmaceuticals Inc.*, 99–4659 under lead docket number 99–2181.

After the Court heard the arguments of counsel and while the matter was under consideration, the Court received from counsel for Mylan and counsel for Bayer a series of correspondence addressing Mylan's voluntarily withdrawal of certain of its counterclaims. By letter dated January 23, 2001, the Court received from Bayer's counsel a Joint Stipulation and Order of Dismissal dismissing with prejudice Counts I, II, III, that portion of Count IV relating to unenforceability, and Count V of Mylan's counterclaims. The Court signed and entered the Joint Stipulation and Order on January 24, 2001.

## II. BACKGROUND

The compound at issue here that is the subject of the defendants' ANDAs and covered by Bayer's '444 patent is known as ciprofloxacin.[2] Ciprofloxacin is a powerful antibiotic that can be administered orally and is effective against a broad range of bacteria. Thus, the drug is widely prescribed and used.

The ciprofloxacin molecule as disclosed in the '444 patent is illustrated as follows:

[1] Counsel for all parties are to be commended on both their written submissions to the Court as well as their oral arguments in this complex and important case. The issues have been presented to the Court in a clear, cogent and persuasive manner that has assisted the Court greatly in resolving the issues before it. Counsel for all parties represented their clients ably.

[2] The relevant facts are taken from the parties' statements of undisputed material facts submitted in accordance with Rule 56.1 of the Local Civil Rules of the United States District Court for the District of New Jersey.

Ciprofloxacin

Between the *** mid–1970's and 1980, a group of Bayer scientists, including Dr. Klaus Grohe, were involved in a project whose purpose was to synthesize derivatives of known antibacterial agents and develop broad spectrum antibiotics. During the course of this research, Dr. Grohe and his colleagues discovered that certain molecules that had a cyclopropyl group at the 1–position had particularly potent antibacterial properties.

On September 13, 1980, Bayer filed a German patent application P 30 33 157.8 naming Drs. Grohe, Zeiler and Metzger as inventors. The defendants claim that the first German application's claims were broad enough to cover generically certain compounds within the naphthyridine and quinolone classes of compounds, but that the application contained only examples of naphthyridines. Bayer, on the other hand, states that the disclosures of the application were broad enough to include both naphthyridine and quinolene compounds generally but each claim indicated that the claimed compound is a naphthyridine.

In December 1980, Dr. Grohe experimented with methods to create intermediate materials needed to synthesize ciprofloxacin. Dr. Grohe used his previously published cycloaracylation method in an attempt to make 6–fluoroquinolonic acid ("6 FQA"), the intermediate compound

that when combined with piperazine yields ciprofloxacin. Schein claims that Dr. Grohe first experimented with 5–nitrobenzoyl halide as a starting compound, but failed to achieve the desired result, and then attempted to synthesize 6–FQA using 6–nitrobenzoyl halide as a starting material, which also proved unsuccessful. Schein claims that in early 1981 Dr. Grohe again attempted to make 6–FQA and ciprofloxacin using the cycloaracylation method, but this time used 5–fluorobenzoyl halide as the cycloaracylation starting compound. Bayer, on the other hand, claims that Dr. Grohe planned from the outset to use the cycloaracylation method with a 5–fluoro starting compound. According to Bayer, Dr. Grohe learned from a process known as retrosynthesis that he should begin the process of making 6–FQA with a starting compound that had a fluorine atom in the 5 position. Dr. Grohe did not have such a compound available to him. He, therefore, attempted to make 6–FQA using a nitro starting compound that was available in his lab, but this starting material did not have a fluorine atom in the 5 position. Dr. Grohe's efforts yielded a starting material, but not the 6–FQA he needed, that is 6–FQA with a fluorine atom in the 5–position. The nitro starting material that Dr. Grohe first used is illustrated as follows:

To make 6–FQA, Dr. Grohe tried to substitute a fluorine group for the nitro group in his intermediate compound using a procedure known as the Balz Schiemann reaction, but was not successful. Dr. Grohe then asked another Bayer chemist, Dr. Klauke, to provide him with a starting compound that had a fluorine atom in the 5–position and leaving groups in the 2– and 4–positions. The starting material that Dr. Grohe requested from Dr. Klauke is illustrated as follows:

Pursuant to Dr. Grohe's request, Dr. Klauke synthesized 2,4–dichloro 5–fluorobenzoyl chloride (the "Klauke compound"). The Klauke compound is illustrated as follows:

Using the Klauke compound, Dr. Grohe synthesized 6–FQA using the cycloaracylation method, which, when combined with piperazine, yielded ciprofloxacin. Graphically, the synthesis of ciprofloxacin is as follows:

5-fluorobenzoyl halide $\xrightarrow{\text{cycloaracylation}}$ 6-FQA $\xrightarrow{\text{+ piperazine}}$ ciprofloxacin.

On August 13, 1981, Bayer filed the '560 application in the United States, which was the foreign counterpart to its first German application. The most significant difference between the first German application and the '560 application was that Bayer included ciprofloxacin as an example in the '560 application, although it claims that the structure of ciprofloxacin was within the generic description in the first German application.

On July 17, 1981, Dr. Grohe wrote to Dr. Simon, who was Bayer's in-house patent agent, to inform Simon that the Roger–Bellon method of synthesizing the disclosed antibiotics described in the first German application could not be used to synthesize ciprofloxacin. Bayer claims that this communication was the result of Simon asking Grohe to confirm that the manufacture and use of ciprofloxacin would not infringe the patent rights of others. To that end, according to Bayer,

Dr. Simon asked Dr. Grohe to confirm that ciprofloxacin could not be made using the known Gould Jacobs and Roger–Bellon methods as of the dates of the prior art references. The parties dispute whether Bayer failed to disclose in the '560 application a method of synthesizing ciprofloxacin. According to Bayer, the '560 application disclosed the combination of a class of compounds that included 6–FQA with piperazine, which, according to Bayer is an operable method of making ciprofloxacin.

According to Schein, the '560 application disclosed only the Roger Bellon method of synthesis, which cannot be used to make 6–FQA and ciprofloxacin. Bayer, however, argues that the cycloaracylation and Roger Bellon methods are not used to make ciprofloxacin at all. Rather, those methods are used to make the intermediate compound necessary to make ciprofloxacin–6 FQA–which Dr. Grohe disclosed in the '560 application. Bayer further argues that the cycloaracylation method of making 6–FQA and the requisite starting material was known in the prior art.

In addition to filing patent applications in Germany and the United States, Bayer also filed related applications in Chile on August 12, 1981, in Spain on September 2, 1981, in Argentina on September 3, 1981 and in South Africa on September 2, 1981. The Chilean patent issued on May 7, 1982; the Spanish patent issued on April 29, 1982; the Argentine patent issued on September 2, 1982; and the South African patent issued on August 25, 1982, however, Bayer argues that while the South African patent issued on August 25, 1982, its rights were not "fixed and determined" under South African law and the patent was thus unenforceable until May 25, 1983.

On October 29, 1981, Bayer filed a second German application in which it described the synthesis of ciprofloxacin using the cycloaracylation method using the Klauke compound as a starting material. On October 22, 1982, Bayer filed a United States counterpart to the second German application, United States Application No.

636,112 (the "'112 application"). On May 24, 1984, Bayer filed United States Application No. 614,923 (the "'923 application") as a continuation-in-part of the '560 and '112 applications. The '923 application issued as the '444 patent on June 2, 1987.

In or about 1992, Bayer brought an infringement action on the '444 patent against another generic drug manufacturer, Barr Laboratories Inc. ("Barr"), alleging that Barr's ANDA seeking FDA approval to market generic products containing ciprofloxacin was an act of infringement. *See Bayer Ag v. Barr Laboratories Inc.,* 92–0381(WK), 39 U.S.P.Q.2d 1862, 1863, 1996 WL 304544 (S.D.N.Y. June 5, 1996). In that case, the parties each moved for partial summary judgment, Barr seeking to sustain its invalidity defense asserted pursuant to 35 U.S.C. §, 102(d), and Bayer seeking to strike that defense arguing that 35 U.S.C. § 119 entitled it to rely on a foreign filing date. *See id.* The court denied both parties' motions and in doing so rejected Bayer's § 119 argument and found that fact issues precluded summary judgment on Barr's § 102(d) defense. *See id.* In or about January 1997, the parties to that action entered into a consent judgment. *See* Appendix of Exhibits in Support of Bayer's Memorandum in Opposition to Mylan's Motion for Summary Judgment and in Support of Bayer's Cross Motion for Summary Judgment at Exh. D. According to the express terms of the consent judgment, the parties agreed that the '444 patent "is valid and enforceable as to Barr Laboratories, Inc. in all respects." *Id.* The judgment further provided that judgment is entered in favor of the plaintiffs, Bayer, and that all claims and counter-claims are dismissed. *Id.*

On July 25, 1997, Bayer filed a request for reexamination of the '444 patent with the United States Patent and Trademark Office ("PTO"). In connection with its request for reexamination, Bayer submitted to the PTO certain litigation papers from

the *Bayer Ag v. Barr Laboratories Inc.* action, including documents related to Barr's invalidity defense asserted under 35 U.S.C. § 102(d). On February 9, 1999, the PTO issued a Reexamination Certificate essentially affirming the validity of the '444 patent. *See* Declaration of Elizabeth A. Leff, Esquire at Exhibit A–1.

## III. DISCUSSION

The Court will first set forth the applicable standards it is applying to the instant motions, and then address Bayer's motion to strike portions of Schein's reply brief before turning to the substantive issues raised with respect to the defendants' § 102(d) claim of invalidity.

### A. SUMMARY JUDGMENT STANDARD IN PATENT CASES

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996).

In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).

In deciding whether triable issues of fact exist, Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). The rule does not increase or decrease a party's ultimate burden of proof on a claim. Rather, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Anderson,* 477 U.S. at 255–56, 106 S.Ct. 2505.

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material fact remains. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented ... by depositions, answers to interrogatories, or further affidavits," *id.,* "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348; *see also Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 ("by its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion ... the requirement is that there be no genuine issue of material fact.").

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *see also Lujan v. National Wildlife Fed.,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("[t]he object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit"); *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992) ("to raise a genuine issue of material fact . . . the [nonmoving party] need not match, item for item, each piece of evidence proffered by the movant," but "rather must exceed the 'mere scintilla' threshold"), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). Under Rule 56(e), "[a] party's failure to make a showing that is 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial' mandates the entry of summary judgment." *Watson v. Eastman Kodak Co.,* 235 F.3d 851, 857–58 (3d Cir.2000) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; citing *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1531 (3d Cir.1990)).

"When evaluating a motion for summary judgment, the court reviews the record evidence through the prism of the evidentiary standard of proof that would pertain at a trial on the merits." *Eli Lilly and Co. v. Barr Laboratories, Inc.,* 222 F.3d 973, 980 (Fed.Cir.2000) (citing *Anderson,* 477 U.S. at 252–53, 106 S.Ct. 2505). In patent cases, a patent carries with it a presumption of validity that can be overcome only by through clear and convincing evidence proving invalidity. *See id.* (citing 35 U.S.C. § 282; *United States Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1563 (Fed.Cir.1997)). Thus, an alleged infringer moving for summary judgment must submit to the Court clear and convincing evidence supporting its invalidity defense such that no reasonable jury could find otherwise. *See id.* On the other hand, "a patent holder moving for summary judgment on its adversary's invalidity defense must show that the alleged infringer failed to produce clear and convincing evidence of invalidity." *See id.*

Here, to prevail on their respective motions for summary judgment, the defendants must each show through clear and convincing evidence that the '444 patent is invalid; specifically, that the '560 application does not comply with 35 U.S.C. § 112's best mode requirement. The plaintiffs, to prevail on their cross-motions, must show that the defendants have failed to produce sufficient evidence proving invalidity.

**B.   THE PRESUMPTION OF VALIDITY UPON REEXAMINATION**

■   Before turning to the merits of the parties' arguments, the Court must first address Bayer's assertion that the reexamination conducted in the PTO from 1997–99 imposes upon Schein a heavier burden of proof of invalidity. The defendants counter that the PTO's determinations on reexamination of the '444 patent are entitled to no more deference than any other patent because the reexamination proceedings were conducted *ex parte* between Bayer and the PTO examiner and the examiner was not presented with sufficient information regarding their best mode arguments.

"The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282. Underlying this provision of the Patent Act is "the basic proposition that a government agency such as the [PTO] was presumed to do its job." *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359 (Fed.Cir.), *cert denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984) (citing *Morgan v. Daniels,* 153 U.S. 120, 125, 14 S.Ct. 772, 38 L.Ed. 657 (1894)). The case law seems to

suggest that this presumption is even stronger when the governmental determination was made by an agency like the PTO whose examiners are presumed to have expertise in the subject matter of the patents they examine. *See id.* Courts have interpreted the statutorily created presumption to place the burden of coming forward with clear and convincing evidence of invalidity on the shoulders of the party asserting the defense. *See id.*

Bayer argues that where, as here, a patent claim has survived a reexamination, the burden on the defendants is even heavier. Although Bayer does not articulate what that burden might be, it seems to be suggesting that the burden on the defendants is now something greater than clear and convincing, but not as onerous a burden as beyond a reasonable doubt. Bayer relies primarily on three cases in support of its argument for placing a heavier burden on the defendants. In *Gould v. Control Laser Corp.*, 705 F.2d 1340 (Fed.Cir.1983), the court considered whether an order from the district court staying an action pending completion of a reexamination proceeding was an appealable order, concluded that it was not, and dismissed the appeal. In reaching its decision, the court examined generally the purpose of reexamination proceedings before the PTO and noted in *dicta* that, "One purpose of the reexamination procedure is to eliminate trial of that issue (when the claim is canceled) or to facilitate trial of that issue by providing the district court with the expert view of the PTO (when a claim survives the reexamination proceeding)." *Id.* at 1342. The court did not, however, say that reexamination places a heavier burden on one challenging validity. Rather, the court merely suggested in *dicta* that a district court must consider the PTO's decision sustaining a claim after reexamination. Similarly, in *Custom Accessories, Inc. v. Jeffrey–Allan Indus., Inc.*, 807 F.2d 955, 961 (Fed.Cir. 1986), the court reversed a district court's judgment of invalidity because, among other things, the district court failed "to give

any credence to the PTO reexamination proceeding, which upheld the validity of [the relevant] claims ....". The court then restated the district court's obligation to consider an examiner's conclusions reached in an original application or upon reissue as evidence when deciding whether the patent is invalid. *See id.* (quoting *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1139 (Fed.Cir.1985)). The court did not hold that the party has a heavier burden of proof on an invalidity defense after reexamination. Rather, the court held that the district court committed reversible error by not considering the PTO's determinations. Finally, Bayer relies on *E.I. Du Pont de Nemours & Co. v. Cetus Corp.*, 1990 WL 305551, 19 U.S.P.Q.2d 1174, 1178–79 (N.D.Cal. Dec.3, 1990), where the district court—a court of coordinate jurisdiction—did state that reexamination places a heavier burden on one challenging validity, but the Federal Circuit cases relied on by that court, *Interconnect* and *American Hoist*, do not support the proposition for which they are cited Thus, the Court declines to follow the *Cetus* Court's decision.

The Court concludes that where a patent survives reexamination, the burden on a party asserting an invalidity defense is not heavier, that is, even in the face of a reexamination proceeding the party asserting the defense still must show by clear and convincing evidence that the patent is invalid. However, where the specific claim of invalidity, in this case a best mode defense, has been presented to the PTO in a reexamination proceeding, the challenger's task may be made more difficult because the Court must consider the PTO's conclusions as evidence of validity. Thus, the challenger must come forward with clear, convincing and specific evidence that would tend to negate the conclusions reached by the PTO. The defendants' burden of proof here is no heavier, but may be more difficult to meet to the extent that the PTO considered the best mode issues with respect to the '560 application raised

here and rejected those arguments in affirming the validity of the '444 patent. Therefore, before turning to the substance of the invalidity arguments, the Court must examine what issues were presented to the PTO on reexamination and what conclusions the PTO reached on those issues.

According to Bayer, it presented to the PTO each of the § 102(d) invalidity defenses asserted by Barr in the earlier litigation, including the best mode defense asserted by the defendants here. Bayer's Patent Owner's Statement of Grounds for Reexamination submitted to the PTO, states, in relevant part:

. In the litigation, Barr contended that the claims of the '444 patent directed to quinoline–3–carboxylic acids, including ciprofloxacin ..., were not entitled to the benefit of the filing date of the ['560 application]. Barr alleged that although the '560 application disclosed starting materials and a method for making quinoline–3–carboxylic acids claimed in the '444 patent, it failed to expressly teach a method for making one of those starting materials–6–FQA. Barr also contented that the absence of such express teachings in the '560 application, together with the alleged inability of those skilled in the art to make that starting material in August, 1981, without undue experimentation, violated the enablement *and best mode requirements of 35 U.S.C. § 112*, whereby, under 35 U.S.C. § 120, the claims of the '444 patent were not entitled to the 1981 filing date of the '560 application.

Schein Exh. 40 at A514–A515 (emphasis added). Bayer goes on to argue in its statement why the '560 application satisfies the best mode requirements of § 112 and why it can rely on the '560 application's filing date to defeat Barr's § 102(d) defense. *See id.* Bayer also presented the PTO with a discussion of Barr's best mode invalidity defense in its "Summary of Barr's 112/102(d) Invalidity Defense and Bayer's Response Thereto." *See* Bayer

Exh. F. Additionally, although the reexamination proceedings before the PTO are by their nature *ex parte*, Bayer submitted to the PTO all of the litigation papers Barr submitted to the United States District Court for the Southern District of New York in support of its defense there and, thus, presented the PTO with one interested party's arguments on the best mode issues arising from the '444 patent and the '560 application.

The defendants ask the Court to discount the voluminous materials submitted by Bayer to the PTO by pointing out that the examiner did not expressly refer to § 112's best mode requirement in her written responses to Bayer's request for reexamination. However, the Court must presume that the examiner did her job and that she considered all of the issues and supporting materials submitted by Bayer for reexamination, including Barr's § 102(d) defense as set forth in its litigation papers from the Southern District of New York action, notwithstanding the fact that the examiner did not expressly dispose of the best mode/ § 102(d) issues in her written responses to the request for reexamination.

Accordingly, the Court concludes that Bayer submitted to the PTO for reexamination the same claims of invalidity on best mode grounds raised here by the defendants, and that the defendants, therefore, have the burden to come forward with clear and convincing evidence that would tend to negate the PTO's conclusion that the '444 patent was not invalid under § 102(d) and § 112, ¶ 1.

## C. BAYER'S MOTION TO STRIKE PORTIONS OF SCHEIN'S REPLY BRIEF

One last additional threshold issue that the Court must address before turning to the substance of the parties' arguments is Bayer's motion to strike portions of Schein's reply brief. Bayer seeks to strike two of the arguments raised by Schein in its reply brief submitted in further support of its motion for summary judgment.

First, Bayer seeks to strike Schein's reply brief to extent that Schein relies upon foreign patents other than the South African patent in support of its § 102(d) defense. Second, Bayer seeks to strike Schein's reply brief to the extent that Schein argues in the brief that Dr. Grohe preferred an entire class of compounds as a starting compound to synthesize 6–FQA rather than specifically preferring the Klauke compound. Schein argues that it did rely upon other foreign patents in support of its § 102(d) defense in its opening brief and that it merely addressed those patents more fully in its reply brief in response to Bayer's arguments with respect to South African law. Schein further argues that with respect to the Klauke compound, it merely accepted as true for purposes of its motion Dr. Grohe's assertion in his affidavit submitted in response to Schein's motion for summary judgment that Dr. Grohe did not necessarily prefer the Klauke compound, but rather an entire class of compounds as a starting material for 6–FQA.

■ "It is axiomatic that reply briefs should respond to the respondent's arguments or explain a position in the initial brief that the respondent has refuted." *Elizabethtown Water Co. v. Hartford Casualty Ins. Co.*, 998 F.Supp. 447, 458 (D.N.J.1998). The rationale for this rule is self-evident-because the local rules do not permit sur-reply briefs, *see* L.Civ.R. 7.1(d), a party opposing summary judgment has no opportunity to respond to newly minted arguments contained in reply briefs. *See Santiago v. City of Vineland*, 107 F.Supp.2d 512, 553 (D.N.J.2000). Furthermore, a "passing reference" to an issue in an opening brief will not suffice to put a party on notice that the moving party is moving on that particular issue. *See Laborers' Int'l Union v. Foster Wheeler Energy*, 26 F.3d 375, 398 (3d Cir.1994) (quoting *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1066 (3d Cir.1991)).

■ Here, Schein's reply brief raised for the first time its arguments with respect to Bayer's Chilean, Argentinean and Spanish patents as § 102(d) bars and, thus, those arguments must be stricken. Schein's moving brief, while mentioning the Chilean, Argentinian and Spanish patents, does not base its arguments on the patents filed in those foreign countries and instead argues only that the South African patent acts as a § 102(d) bar. The Court need look no further than Schein's table of contents of its opening brief where the relevant point headings state, "The South African Patent Issued before the Filing Date of the '112 Application on an Application Filed in South Africa More than Twelve Months before the Filing of the '112 Application," and "The South African Patent Claims the Same Invention as the '444 Patent." Passing references to the other foreign patents in footnotes in the opening brief and inclusion of the patents as attachments to that brief,[3] does not put the opposing party on notice that the movant is relying on those patents, especially in light of the extensive discussion of the South African patent in the text of the brief. As noted in footnote 1, *supra*, the parties have provided the Court with exhaustive and well crafted motion papers and the Court has no doubt that had Schein intended to rely on the Chilean, Argentinean and Spanish patents in its motion, it would have done so clearly, expressly and persuasively. It did not. Thus, the Court will disregard Schein's arguments contained in its reply brief based on Bayer's Chilean, Argentinean and Spanish patents.

Bayer's motion to strike Schein's arguments regarding Dr. Grohe's preference for a class of compounds rather than the Klauke compound, however, appears to be a fair response to Dr. Grohe's affidavit submitted in opposition to Schein's motion. Schein argues in its opening brief that Dr.

**3.** Two of the referenced exhibits Schein relies upon in opposition to the motion to strike are not even English translations of the foreign patents. *See* Schein Exhs. 35 and 36.

Grohe preferred the Klauke compound as a staring material when synthesizing 6–FQA. In response, Bayer submitted Dr. Grohe's affidavit, which states in part that he did not prefer the Klauke compound but, rather, an entire class of compounds. Schein argues in its reply brief that even assuming Dr. Grohe's affidavit to be true, it is entitled to summary judgment of invalidity. Schein's arguments raised in its reply brief are a fair response to the assertions in the Grohe affidavit. The Court will consider the arguments contained in Schein's reply brief that are directed at Dr. Grohe's preference of starting materials.

Accordingly, Bayer's motion to strike portions of Schein's reply brief is granted in part and denied in part. Those portions of Schein's reply brief directed at the Chilean, Argentinean and Spanish patents are stricken.[4]

### D. THE DEFENDANTS' § 102(D) DEFENSE

The defendants argue that the '444 patent is invalid under 35 U.S.C. § 102(d) because Bayer filed patent applications in foreign countries more than twelve months prior to filing its counterpart application in the United States—the '112 application—and the foreign patents issued prior to Bayer filing the '112 application. Bayer argues that the defendants' § 102(d) defense fails for four reasons. First, Bayer argues that pursuant to 35 U.S.C. § 120, it is entitled to rely on an earlier filed application-the '560 application filed on August 31, 1981—thus, rendering § 102(d) inapplicable to the '444 patent. The defendants counter that Bayer cannot rely on the '560 application's earlier filing date because the '560 application does not comply with § 112's "best mode" requirement. Second, Bayer argues that the foreign patents cannot operate as § 102(d) bars, under the defendants' theories, because if the defendants are correct that the '560 application is invalid for failure to disclose best mode, then so too are the foreign applications invalid. Thus, Bayer argues, the foreign applications do not qualify as § 102(d) references as a matter of law. Third, Bayer argues that under 35 U.S.C. § 119 it can rely on the filing date of an earlier filed German application as its United States filing date pursuant to 35 U.S.C. § 120. Finally, Bayer argues that Schein cannot rely on the South African patent as a § 102(d) bar because that patent does not qualify as a § 102(d) reference as the patent did not issue before Bayer filed its '112 application. Bayer seeks summary judgment on the defendants' invalidity defenses and partial summary judgment on whether the South African patent is a § 102(d) bar.

### 1. The Section 102(d) Bar

Section 102(d) acts as a bar to receiving a patent in the United States for an invention when the applicant i) files a patent application in a foreign country; ii) files an application in the United States for the same invention more than twelve months after filing the foreign application; and iii) is granted the foreign patent before filing the United States application. See 35 U.S.C. § 102(d).[5] The statute was

---

4. Even though the Court is striking portions of Schein's reply brief, the Court will consider the Chilean, Argentinian and Spanish patents' § 102(d) implications because Mylan raised those patents in its motion for summary judgment and the resolution of the dispositive legal issues is not affected by the locale of the foreign applications. As discussed in Section III.D.4., *infra*, the Court is not reaching the merits of Bayer's argument raised in opposition to Shein's motion that is unique to South African patent law.

5. The statute provides, in pertinent part:

A person shall be entitled to a patent unless—

\*    \*    \*    \*    \*    \*

(d) the invention was first patented or caused to be patented, or was the subject of an inventor's certificate, by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application for patent or inventor's certificate filed more than twelve months before

enacted to encourage the prompt filing of patent applications in the United States by prohibiting inventors from filing patent applications in a foreign country and then delaying for more than twelve months filing the counterpart application in the United States. *See In re Kathawala,* 9 F.3d 942, 947 (Fed.Cir.1993). Section 102(d) is a statutory bar or a loss-of-right provision. *See OddzOn Prods., Inc. v. Just Toys, Inc.,* 122 F.3d 1396, 1402 (Fed.Cir.1997). That is to say, if a United States patent issues contrary to the timing requirements of § 102(d), the patent is invalid. *See Kathawala,* 9 F.3d at 945.

Here, Bayer filed its patent applications in Chile on August 12, 1981, in South Africa on September 2, 1981, in Spain on September 2, 1981 and in Argentina on September 3, 1981. Those foreign patents issued in Spain on April 29, 1982, in Chile on May 27, 1982, in South Africa on August 25, 1982 and in Argentina on September 3, 1982. Bayer filed the '112 application on October 22, 1982–more than twelve months after it filed the foreign applications and after the issuance of the foreign patents. Thus, if the filing date of the '112 application is the relevant date, the '444 patent is invalid under 35 U.S.C. § 102(d).

### 2. Section 120—Benefit of Earlier Filing Date of the '560 Patent

Bayer argues, however, that the filing date of the '112 application is not the relevant filing date because Bayer can rely on the filing date of the '560 application—August 13, 1981—as the applicable United States filing date pursuant to 35 U.S.C. § 120. Thus, according to Bayer, the foreign patents do not act as 102(d) bars to the '444 patent.

■ "It is elementary patent law that a patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application, as required by 35

the filing of the application in the United

U.S.C. § 112." *In re Chu,* 66 F.3d 292, 297 (Fed.Cir.1995) (citing 35 U.S.C. § 120; *Mendenhall v. Cedarapids Inc.,* 5 F.3d 1557, 1566 (Fed.Cir.1993), *cert. denied,* 511 U.S. 1031, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994); *Litton Sys., Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1438 (Fed.Cir.1984)). The statute provides, in pertinent part: "An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States ..., which is filed by an inventor or inventors named in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application...." 35 U.S.C. § 120.

It is not disputed that the disclosures in the '560 application provide support for the claims in the '112 application. Thus, Bayer is entitled to the benefit of the earlier filing date of the '560 application as long as the '560 application satisfies the requirements of the first paragraph of § 112. The critical and dispositive issues here is whether the '560 application satisfies the best mode requirements of the first paragraph of 35 U.S.C. § 112.

### 3. Section 112's Best Mode Requirement

The defendants argue that Bayer cannot rely on the filing date of the '560 application because the '560 application does not disclose the best mode of making ciprofloxacin that was known to the inventor at the time Bayer filed the application. Bayer counters with two general arguments. First, Bayer argues that the '560 application complied with § 112 because that statute does not require Bayer to disclose a method of making ciprofloxacin but, rather, requires it to disclose the best mode of practicing the invention. Alternatively, Bayer argues that even if it was required to disclose in the '560 application the best

States. . . .

method of making ciprofloxacin, it in fact disclosed that method when it disclosed the combination of 6–FQA with piperazine.

"Pursuant to section 112, ¶ 1, a patent specification must set forth the 'best mode contemplated by the inventor of carrying out his invention.'" *Eli Lilly and Co. v. Barr Laboratories, Inc.*, 222 F.3d 973, 980 (Fed.Cir.2000) (quoting 35 U.S.C. § 112, ¶ 1).[6] As has been said of the concept of minimum contacts, the best mode requirement is easily stated and, yet, exceptionally challenging to apply.

■ The case law from the Federal Circuit indicates that the best mode requirement encompasses a two-pronged inquiry. *See id.* (citing *Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 927–28 (Fed. Cir.1990)). "First, the factfinder must determine whether, at the time of filing the application, the inventor possessed a best mode for practicing the invention." *Id.* (citing *Fonar Corp. v. General Elec. Co.*, 107 F.3d 1543, 1548 (Fed.Cir.1997)); *United States Gypsum Co. v. National Gypsum Co.*, 74 F.3d 1209, 1212 (Fed.Cir. 1996). This prong requires the factfinder to consider the subjective knowledge of the inventor at the time the application is filed. *See id.* "Second, if the inventor possessed a best mode, the factfinder must determine whether the written description disclosed the best mode such that one reasonably skilled in the art could practice it." *Id.* at 981 (citing *Fonar*, 107 F.3d at 1548; *U.S. Gypsum*, 74 F.3d at 1212). The second prong requires an objective analysis of the disclosures in the application compared to the relevant skill in the art. *See id.* "[T]he extent of information that an inven-

tor must disclose depends on the scope of the claimed invention." *Id.* (citing *Engel Indus. v. Lockformer Co.*, 946 F.2d 1528, 1531 (Fed.Cir.1991)).

### a) Dr. Grohe's Preferred Method of Making 6–FQA

The defendants assert that it is undisputed that Dr. Grohe had a preferred method in 1981 of synthesizing 6–FQA: the cycloaracylation method using a 5 fluorobenzoyl halide, such as the Klauke compound, as a starting material.[7] Bayer argues that Dr. Grohe had no preference in 1981 for the Klauke compound or any other particular starting material necessary to make 6–FQA, but that he used the cycloaracylation method and 5–fluorobenzoyl halide merely because that was what he had available to him at the time, through Dr. Klauke, and that the process of developing the starting material was known to one skilled in the art.

Under the first prong of the best mode analysis, the Court must determine "whether, at the time the inventor filed his patent application, he knew of a mode of practicing his claimed invention that he considered to be better than any other." *Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 928 (Fed.Cir.1990). "This part of the inquiry is wholly subjective, and resolves whether the inventor must disclose any facts in addition to those sufficient for enablement." *Id.* It is only after the Court determines that the inventor knew of a preferred method of practicing the invention that the Court moves to the second prong of the analysis and considers

---

6. The statute provides, in pertinent part: "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112, ¶ 1.

7. As discussed in section III.C., *supra*, Schein initially argued that Dr. Grohe preferred using the Klauke compound as a starting material, but in its reply brief filed in response to Bayer's opposition, specifically in response to Dr. Grohe's affidavit, modified that position and argue now, just as Mylan argued in its moving papers, that Dr. Grohe preferred in 1981 a class of 5–fluorobenzoyl halide compounds, which include among them the Klauke compound.

whether the application disclosed this method. *See id.*

Dr. Grohe testifies in his affidavit that "[i]n December 1980[he] attempted for the first time to make FQA using the cycloaracylation method." Grohe Aff. at ¶ 5. Dr. Grohe further testifies that he "selected the 2,4–dichloro–5–nitro benzoyl chloride starting compound because it was readily available in [his] laboratory." *Id.* He states that he did not know at the time whether or not he would be able to convert the resulting intermediate into the requisite 6–fluoro compound. *See id.* After failing to create the needed intermediate compound, Dr. Grohe states that he asked a Dr. Klauke to make for him a fluoro starting compound, specifically, Dr. Grohe told Dr. Klauke that he needed a benzoyl halide with leaving groups in the 2– and 4– positions and a fluorine atom in the 5– position. *See id.* at ¶ 6. Dr. Grohe further states that he had no preference for a method of synthesizing the requisite 5– floro benzoyl halide starting material. *See id.* at ¶ 7. On the question of whether he had a specific preference of starting materials, Dr. Grohe states in his affidavit:

> Prior to August 13, 1981, I did not conduct, and to the best of my knowledge no one else at Bayer conducted, any comparative tests with the cycloaracylation method and any other methods, in order to see whether the cycloaracylation method would be the best method. The cycloaracylation method did the job of making our first batch of ciprofloxacin, and I focused on making enough of the ciprofloxacin so that the microbiologists at Bayer could perform preliminary microbiological tests. I was interested only with making the compound, not with finding the best way of doing so. I was never involved in the commercial production of ciprofloxacin. Commercial production in large batches began only after August 13, 1981 in any event. I never thought about whether this method was better or worse than any other method and did not have a

preference for the cycloaracylation method over any other method. For these reasons, I did not conclude at that time that the cycloaracylation method was the "best" method for making ciprofloxacin.

*Id.* at ¶ 10.

Thus, the undisputed testimony before the Court indicates that Dr. Grohe did not have a preference in 1981 for the Klauke compound or any other particular compound for use as a starting material in the synthesis of 6–FQA. Rather, the Court concludes that the evidence demonstrates that Dr. Grohe had a preference prior to August 13, 1981 for a starting material comprised of benzoyl halide with leaving groups in the 2– and 4–positions and a fluorine atom in the 5–position so that he could create 6–FQA through the cycloaracylation method. This was the only method known to Dr. Grohe to synthesize the 6–FQA intermediate. However, there is no evidence in the record that Dr. Grohe preferred any particular method to make this starting material, only that he knew that he needed a benzoyl halide with leaving groups in the 2– and 4–positions and a fluorine atom in the 5–position. This, according to Dr. Grohe, was the method that he determined through experimentation would produce the desired result.

b) *The '560 Application's Description of the Preferred Mode.*

■ The defendants argue that the '560 application does not satisfy the best mode requirement because Dr. Grohe did not disclose in the application the only method he knew that would successfully synthesize ciprofloxacin—the cycloaracylation method using a benzoyl halide with leaving groups in the 2– and 4–positions and a fluorine atom in the 5 position, which included the Klauke compound, as a starting material. Bayer argues that the '560 application satisfies the best mode requirement for three separate reasons. First, Bayer argues that the '560 application need not describe the best mode for making ciprofloxacin and its starting materials because the

method does not affect the properties of ciprofloxacin or improve its performance. Second, Bayer claims that even if it was required to disclose a best mode of making ciprofloxacin, the '560 application satisfied the requirement because it described a method of making ciprofloxacin by combining 6–FQA and piperazine. Third, Bayer claims that even if there was a requirement for disclosing a method for making the 6–FQA starting compound, Bayer satisfied this requirement because a person of ordinary skill in the art would have made 6–FQA using the published cycloaracylation method.

The Court's analysis must be guided by the *Lilly* decision, the most recent pronouncement from the Federal Circuit on the best mode issue—a decision that was both timely and topical for purposes of the pending motions—where the court held that failure to disclose in a patent application a method of synthesizing a starting compound does not violate § 112's best mode requirement where the patent does not claim the starting material and where the material was commercially available or known in the prior art. *See Lilly*, 222 F.3d at 981–82. In *Lilly*, the court considered a challenge on best mode grounds of a patent where the inventor failed to disclose a preferred method for synthesizing an unclaimed starting material necessary to make the claimed invention, which, as here, was a pharmaceutical chemical compound. *See id.* The compound at issue in that case was fluoxetine hydrochloride, which is an antidepressant and the active ingredient in the ubiquitous anti-depressant drug Prozac. *See id.* at 975–76. The patents at issue in that case identified a compound known as p-trifluoromethylphenol hydrochloride as a starting material needed for making fluoxetine hydrochloride. *See id.* at 978–79. In conducting clinical trials, the inventor developed his own method for synthesizing p-trifluoromethylphenol hydrochloride, but did not disclose this method in the patent application. *See id.* The *Lilly* Court held "that failure to disclose the synthesizing method

does not contravene the best mode requirement." *Id.* at 981.

The court further held that "while the best mode for developing fluoxetine hydrochloride involves use of p-trifluoromethylphenol, the claimed inventions do not cover ptrifluoromethylphenol and the patents do not accord [the patent holder] the right to exclude others from practicing [the inventor's] method for synthesizing p-trifluoromethylphenol." *Id.* at 982. Thus, the court held that, "the best mode requirement does not compel disclosure of [the inventor's] unclaimed method for synthesizing procurement." *Id.* at 982.

Here, this Court must begin its analysis by examining the scope of the claimed invention. *See Lilly*, 222 F.3d at 981. In this case, as in *Lilly*, the '444 patent does not claim the cycloaracylation method of making 6–FQA using a 5–fluoro benzoyl halide starting material. Thus, the '444 patent does not give Bayer the right to exclude others from practicing Dr. Grohe's method for synthesizing ciprofloxacin using the cycloaracylation method and 6–FQA. Rather, the patent claims the compound ciprofloxacin and certain clinical antibacterial uses for the compound. Thus, under *Lilly*, Bayer had no obligation under 35 U.S.C. § 112 to disclose the method of making the starting material necessary to begin the cycloaracylation process that yielded the 6–FQA intermediate compound. The cycloaracylation method and the 5–fluoro benzoyl halide starting material "were not linked to the intrinsic quality" of ciprofloxacin. *See Lilly*, 222 F.3d at 983. Nor did Bayer receive from the '444 patent the right to exclude others from practicing the method of synthesis. *See id.* at 982. Thus, the best mode requirement does not compel disclosure of the unclaimed method and the unclaimed starting material beyond enablement. *See id.*

■ However, the *Lilly* Court also noted, "To be sure, if the best mode for carrying out a claimed invention involves

novel subject matter, then an inventor must disclose a method for obtaining that subject matter even if it is unclaimed." *Lilly,* 222 F.3d at 982 (citing *Applied Med. Resources Corp. v. United States Surgical Corp.,* 147 F.3d 1374, 1377 (Fed.Cir.1998); *Wahl Instruments,* 950 F.2d at 1583–84). But, the particulars of making an invention "do not necessarily equate with the 'best mode' of 'carrying out' an invention." *Wahl,* 950 F.2d at 1579. "[T]here is no mechanical rule that a best mode violation occurs because the inventor failed to disclose particular manufacturing procedures beyond the information sufficient for enablement." *Id.* at 1580. The Court must look to the scope of the claims, the relevant skill in the art and all of the surrounding circumstances to determine "whether the inventor's failure to disclose particulars of [synthesis] gives rise to an inference that he concealed information which one of ordinary skill in the art would not know." *Id.* (citing *Engel Indus., Inc. v. Lockformer Co.,* 946 F.2d 1528, 1531–32 (Fed.Cir.1991); *Randomex, Inc. v. Scopus Corp.,* 849 F.2d 585, 587 (Fed.Cir.1988)).

▮ Here, unlike in *Lilly,* the starting material necessary to make 6–FQA through the cycloacrylation method was not an off-the-shelf compound or commercially available, but *Lilly* does not require disclosure of a way to synthesize the compound whenever the compound is not commercially available. Rather, the Federal Circuit requires disclosure of the method of synthesis where the unclaimed starting compound and its method of synthesis is novel and unknown to one skilled in the art. *See Lilly,* 222 F.3d at 982; *Wahl,* 950 F.2d at 1580; *Chemcast,* 913 F.2d at 928. The portion of the opinion relied upon by the defendants themselves states that "if the best mode for carrying out a claimed invention involves novel subject matter, then the inventor must disclose a method for obtaining that subject matter even if it is unclaimed." *Lilly,* 222 F.3d at 982 (citations omitted). Thus, the inquiry focuses on what was known to one of ordinary skill

in the art. *See Chemcast,* 913 F.2d at 928 (holding that "[a]ssessing the adequacy of the disclosure, as opposed to its necessity, is largely an objective inquiry that depends upon the scope of the claimed invention and the level of skill in the art."); *Wahl,* 950 F.2d at 1580 (citations omitted) (enumerating factors that must be examined to determine whether the inventor "concealed information which one of ordinary skill in the art would not know."). Here, the uncontroverted evidence before the Court indicates that one skilled in the art would have known in August 1981 how to synthesize 6–FQA with the appropriate starting material given the disclosure in the '560 application and what was known in the prior art.

Bayer has presented the Affidavit of James D. Wuest, PhD, which is uncontested by any affidavit testimony from the defendants. In his affidavit, Dr. Wuest states that "it would have been apparent to a synthetic organic chemist skilled in the art [in August 1981] that 6–FQA compounds could have been made, without undue or unreasonable experimentation, by the synthetic method taught in published German patent application 28 08 070 . . . and its corresponding European patent application 0 004 279 . . ., which were published in 1979." Wuest Aff. at ¶ 9. Dr. Wuest further states that "known precursor compounds to make various 6–FQA compounds by the [cycloacrylation method] . . . were readily available to those skilled in the art as of August 13, 1981, and those precursors could have been prepared by routine synthetic procedures." *Id.* at ¶ 10. Finally, Dr. Wuest states that a person skilled in the art would have been able to convert any number of commercially available materials into a 5–fluoro compound needed as a starting material. *See id.* at ¶ 15.

▮ Schein argues in response to Dr. Wuest's affidavit that "an inventor may not omit a step from his best mode method of manufacture simply because that step is well-known to a person of ordinary skill in

the art." *See* Schein's Reply Brief in Further Support of Its Motion for Summary Judgment and in Opposition to Bayer's Motion for Summary Judgment at 10. However, *Lilly* and the cases cited in that opinion seem to hold that the inverse is true: An inventor may omit from his patent application a step in the method of synthesis, beyond enablement, where that step is well known to a person of ordinary skill in the art. *Lilly* teaches that where, as here, the relevant disclosure involves a method of synthesis of an unclaimed precursor or intermediate compound, the best mode requirement does not compel the inventor to disclose the method of synthesis where the compound is commercially available or the method of synthesis is known to one of ordinarily skilled in the art. *See also Young Dental Mfg. Co., Inc. v. Q3 Special Prods., Inc.*, 112 F.3d 1137, 1144 (Fed.Cir.1997) (holding that "to satisfy the second inquiry of the best mode test, an inventor need only disclose information about the best mode that would not have been apparent to one of ordinary skill in the art.").

Shein states in its Rule 56.1 Statement that "the [cycloaracylation] method had been devised by Dr. Grohe, and was described in a German patent publication referred to by Bayer's internal designation as 'the LeA 18–670 application.'" Defendants' Statement Under Local Rule 56.1 of Undisputed Facts in Support of Their Motion for Summary Judgment ("Shein's Rule 56.1 Statement") at ¶ 6. The cycloaracylation method was published in 1975. *See* Mylan's Statement Under Local Rule 56.1 of Undisputed Facts in Support of Their Motion for Summary Judgment ("Mylan's Rule 56.1 Statement") at ¶ 9. Shein also claims that "Dr. Klauke completed his synthesis of the Klauke compound[ ] using a synthesis pathway that was unknown in the art at the time." *See* Schein's Rule 56.1 Statement at ¶ 15. However, the evidence Shein cites for this statement does not support its assertion. Schein cites three exhibits to its moving papers, Exhibits 18, 19 and 20, none of which say anything about prior art and the synthesis of the Klauke compound. For example, Exhibit 18 is a Bayer internal document titled "Invention Notice," which states, in pertinent part: "The compounds according to the invention already claimed in Le A–20–527 were produced by Dr. Grohe. A production process for one of the starting compounds, the 2,4–dichloro–5fluoro–benzoylchloride unknown in the literature was developed by Dr. Klauke at the request of Dr. Grohe." Schein Exh. 18. This exhibit states that the Klauke compound, rather than the method of synthesis, was unknown in the literature and, as discussed above, the uncontested evidence before the Court is that Dr. Grohe did not have a preference for the Klauke compound in 1981. Thus, the fact that the Klauke compound was "unknown in the literature" does not go to best mode.

On the other hand, both Dr. Klauke and Dr. Grohe testified in their depositions that Dr. Klauke used a "series of known reaction steps to produce the . . . 'Klauke compound.'" Bayer's Response to Schein's Statement of Undisputed Facts, Statement of Additional Facts in Opposition to Schein's Motion for Summary Judgment, and Local Rule 56.1 Statement of Undisputed Facts in Support of Mayer's Cross–Motion for Partial Summary Judgment ("Bayer's Rule 56.1 Statement") at ¶ 15. Specifically, in response to a question asking Dr. Klauke why he did not consider any other compounds than what became known as the Klauke compound, Dr. Klauke testified:

> When talking to Dr. Grohe, I had the idea that I was to produce a benzoyl halogenide which in meta position has a fluorine [atom] and in 2 and 4 position a leaving group. Then I looked at the list of our storage cellar and there I found the corresponding nitro-dichlorotoluene, the structure of which makes it possible to produce one of the required—desired compounds. And then I tried the known reaction sequence, and it worked well. And I handed over the preparation.

Klauke Deposition at 242–43. Thus, according to Dr. Klauke's uncontroverted testimony, he used an off-the-shelf compound found in Bayer's storage cellar and created the requested compound using "the known reaction." Neither defendant, Schein nor Mylan, has not come forward with any evidence raising a genuine issue of material fact on this point. Dr. Klauke used readily available materials and a known process to create the necessary starting material.

The result the Court reaches here is in accord with pre-*Lilly* decisions from the Federal Circuit on the best mode defense—decisions cited repeatedly in *Lilly* itself. For example, in *Wahl Instruments, Inc. v. Acvious, Inc.*, the court decided whether the non-disclosure of an "undisclosed manufacturing technique by which commercial versions of egg-timers were made and to the materials and sources of supply for material used in them" violated the best mode requirement. 950 F.2d at 1579. In that case, the inventor consulted with a plastics fabricator to create a manufacturing method for the egg-timers. *See id.* at 1577. The plastics fabricator suggested modifications to the egg-timers so that they could be mass produced through the embedment molding technique. *See id.* The Court noted that

> there is no mechanical rule that a best mode violation occurs because the inventor failed to disclose particular manufacturing procedures beyond the information sufficient for enablement. One must look at the scope of the invention, the skill in the art, the evidence as to the inventor's belief, and all of the circumstances in order to evaluate whether the inventor's failure to disclose particulars of manufacture gives rise to an inference that he concealed information which one of ordinary skill in the art would not know.

*Id.* at 1580 (citations omitted). Like the '444 patent here, the *Wahl* Court found that the "invention does not claim a method of manufacturing but the device itself, regardless of how actually put together, and also a method of using the device." *Id.* at 1581. Here, the '444 patent does not claim a method of synthesizing 6–FQA but, rather, claims ciprofloxacin and its antibacterial uses. In *Wahl*, the court found that "anyone seeking to make the device commercially would have to do no more than present the drawings in the patent to an experienced plastics fabricator to learn that the device lent itself to embedment molding." *Id.* Here, the undisputed facts indicate that anyone seeking to make ciprofloxacin with 6–FQA would have to do no more than present the specifications for the requisite starting material to an experienced fluorine chemist to develop an appropriate starting material such as the Klauke compound.

Under Rule 56, the defendants have the burden on their motions of coming forward with clear and convincing evidence demonstrating that they are entitled to summary judgment of invalidity. *See Lilly*, 222 F.3d at 980. The defendants have failed to meet that burden here and, thus, the defendants' motions for summary judgment must be denied. Bayer has the burden on its cross-motion to show that the defendants' cannot meet their burden. *See id.* Bayer has made the requisite showing. The uncontested evidence before the Court here is that one of ordinary skill in the art in August 1981 would have known how to synthesize the intermediate compound 6–FQA through the cycloaracylation method using a 5 fluoro starting material like the Klauke compound. Thus, the '560 application satisfies the best mode requirement of 35 U.S.C. § 112, ¶ 1, and Bayer is entitled, pursuant to 35 U.S.C. § 120 to rely on the filing date of the '560 application. Therefore, the foreign applications are not statutory bars to the '444 patent under 35 U.S.C. § 102(d). The defendants' motion for summary judgment of invalidity is denied and Bayer's cross-motions for summary judgment on the defendants' invalidity defense are granted.

### 4. *Bayer's Remaining Arguments Are Moot*

Bayer argues in the alternative that the foreign patents are not § 102(d) bars because i) if the '560 application does not satisfy § 112 then neither do the foreign applications and, thus, the foreign applications cannot act as § 102(d) bars; ii) that pursuant to 35 U.S.C. § 119 it is entitled to rely upon the earlier filing date of the first German application; and iii) that the South African patent does not qualify as a § 102(d) reference because it did not become enforceable prior to the filing date of the '560 application. The defendants oppose all of Bayer's alternative arguments.

The Court, however, need not reach these arguments and decide the issues Bayer raises because it has concluded that the '560 application satisfies § 112's best mode requirement and that Bayer is entitled to summary judgment on the defendants' best mode defenses. Bayer's argument that if the '560 application does not satisfy § 112 then neither do the foreign applications is premised on a finding that the '560 application does not satisfy the best mode requirement and all of Bayer's additional arguments are made in the alternative. Accordingly, the Court will not reach the merits of Bayer's additional and alternative arguments, including its motion for partial for summary judgment directed at the South African patent.

### IV. CONCLUSION

For the reasons discussed above, Schein and Mylan's motions for summary judgment are denied, Bayer's motion to strike certain arguments raised in Schein's reply brief is granted in part and denied in part, and Bayer's cross-motions for summary judgment are granted. An appropriate form of order is filed herewith.

### ORDER

This matter having come before the Court upon the motion for summary judgment of defendants/counter-claimants Schein Pharmaceutical, Inc., Danbury Pharmacal, Inc. and Reddy–Cheminor, Inc. (collectively "Schein"), the cross-motion for summary judgment of plaintiffs Bayer AG and Bayer Corporation (collectively "Bayer"), and Bayer's motion to strike certain arguments raised in Schein's reply brief in the two related actions *Bayer AG v. Schein Pharmaceutical, Inc.*, 99–2181 and *Bayer AG v. Schein Pharmaceutical, Inc.*, 99–5093; and upon the motion for summary judgment of Mylan Pharmaceuticals Inc. and Mylan Laboratories Inc. ("Mylan") and the cross-motion for summary judgment of Bayer in *Bayer AG v. Mylan Pharmaceuticals Inc.*, 99–4659; and the Court having considered the parties' submissions; and the Court having heard the arguments of counsel; and for the reasons stated in the Opinion filed herewith;

It is this 9th day of February, 2001 hereby

ORDERED that Shein's motion for summary judgment is DENIED; and it is further

ORDERED that Mylan's motion for summary judgment is DENIED; and it is further

ORDERED that Bayer's motion to strike portions of Schein's reply brief is GRANTED IN PART AND DENIED IN PART; and it is further

ORDERED that Bayer's cross-motion for summary judgment is GRANTED.